## Scott v. Roberts.
## Roberts v. Scott.
(Decided June 12, 1934.)

S. C. FERGUSON for appellant and appellee, John Scott.

HILL & HOBSON for appellee and appellant, Dewey Roberts.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming.

Scott and Roberts were rival candidates at the November, 1933, election for magistrate in one of the districts in Floyd county. When the election commissioners came to count the ballots in the Betsy Lane precinct, they discovered that one of the staples on the box had been sawed in two and that a number of ballots in the jailer's race had been tampered with by marking straight Democratic ballots, and perhaps others, for the Republican candidate for that office, with a larger stencil and a different color of ink. Some of the ballots in the magistrate's race had also been similarly changed, although some of the witnesses had not observed it. The commissioners counted the ballots but refused to accept the returns in any race in that precinct. When the box for Tickey precinct was presented, one of the staples had also been sawed in two on it. The commissioners thereupon declined even to open that box. One of the locks on the Antioch precinct box was not in the staple but was hanging by its chain. A number of ballots in it were found to have been changed in the jailer's race just as in the Betsy Lane precinct box. At first it appears to have been unanimously agreed by the election commissioners that none of these precincts should be considered in any race.

However, the next day after the count and tabulation had been completed and Hatfield, the Democratic member of the commission, had signed the record book, he and Sturgill, the sheriff, by a writing directed the county court clerk to enter the returns of the Antioch precinct in the magistrate's race and in that race only. Thereafter Sturgill indorsed on the book (for a reason not made clear), "Not certifying to Antioch," and signed it. The Republican member of the commission never signed its records or any of the certificates of election because, as he says, of the revelations of these ballot boxes. With the Antioch precinct out, Scott had a majority of one vote. With it in, Roberts had a ma-

jority of seventy-four. Sturgill's own testimony reveals that he was prevailed upon by outside influences to reverse himself and consider the Antioch returns in this race because it would affect the result. It would not have changed any other race. The certificate of election signed only by Hatfield and Sturgill was issued to Roberts. It appears that a suit was filed to have the vote in the Betsy Lane and Tickey precinct counted. When the county clerk went for those boxes to bring them into court, he found that the door of the storage room had been prized open and both of the boxes and the ballots had been stolen. They were not recovered.

We may pause to observe that the sheriff actively participated in the election and the count of the ballots in his capacity as a member of the election commission, although he was a candidate for jailer. It was one of the grounds of contest. This is contrary to section 1596a-2 of the Statutes, which provides that where from any cause the sheriff cannot act as a member of the commission, the circuit clerk shall act in his place. There is no provision in the current statutes disqualifying the sheriff specifically, by reason of his candidacy, from acting as a member of the election commission, but section 1596a-3 declares that no person shall be eligible as an election officer who is a candidate to be voted for at such election. And since the Acts of 1930, c. 49, and of 1932, c. 83 (now section 1482, Statutes Supp. 1933), make it the duty of the members of the election commission to count or supervise the count of the ballots and certify the returns, they are effectually and in reality election officers. Aside from that, since the beginning of an organized system of justice, the practice of a man sitting in judgment in his own case has been abhorred and condemned. There are several things disclosed in this record showing the wisdom of applying that rule in a case such as this. Such participation offends both the letter and the spirit of the law.

In this contest filed by Scott he asked that he be adjudged entitled to the office, but if that could not be done, that it be declared there was no election because the irregularities were such it was impossible to determine who had received a majority of the legal votes. There were several allegations made as grounds for his prayers. Among them he set forth the facts as to the ballot boxes and the action of the election commission-

ers, which he undertook to prove, and did substantially prove, and charged that "there was such a large amount of bribery, corruption, coercion, illegal voting and conduct in the holding of said election, which number of illegal votes was greater than 20% of the votes cast in said race that it is impossible to determine who was legally elected, and that said election should be declared null and void and contestee's purported certificate of election be canceled, set aside, and held for naught." The county clerk testified that the ballot stubs of the Betsy Lane and the Tickey precincts showed a total of 801 ballots cast therein, which was more than 32 per cent. of the total vote cast in all the magisterial district. The returns of the Antioch precinct showed that 289 votes were cast in the magistrate's race. If they be added, there was about 44 per cent. of the total vote involved. The ballot boxes in two other precincts were in questionable condition, but it is not necessary to give them consideration. The special circuit judge who tried the case regarded only the two precincts which were not counted, Betsy Lane and Tickey. He accepted the evidence as to the number of ballots used, and concluded that since more than 20 per cent. of all the votes cast had not been counted, there was no election. Both parties have appealed.

Scott submits that he should be declared elected by this court; but if not, then that the judgment is correct. Roberts maintains that the judgment is altogether erroneous and the contest against him should be dismissed. There is no merit in Scott's claim to the office. Roberts' argument is principally that the allegations of the petition were not sufficient to authorize the setting aside of the election; that it was error to receive the testimony of the county clerk as to what the ballot stubs of the two precincts referred to disclosed, and without his evidence there is none upon which to rest the judgment. There is no merit in the claim of insufficient pleading, for the counting of the ballots is a most important step in the holding of an election and the illegal action complained of occurred before they could be counted.

The argument as to the evidence is that (a) the witness did not specify that these were the stubs of the 1933 election; (b) he did not file the stubs in evidence; and (c) the stubs did not disclose what proportion of the ballots were voted in this one particular race. (a)

The clerk was testifying all along as to the records in this particular election and the criticism is trifling. (b) He was the official custodian of the stubs (section 1482, Statutes Supp. 1933), and was testifying what the records of his office showed. He related what the ballot stubs showed after an examination of them, and we cannot perceive how contestee could have been benefited had the clerk, under the orders of the court, surrendered their custody and filed them as exhibits. (c) The stubs were the only record in existence of what the vote was in the absence of the ballots themselves. While not of the highest degree of evidence, it must be accepted as the best available for that purpose. We think it a very reasonable inference that a large proportion of these ballots were cast for somebody in the magistrate's race, for we are not unmindful of the interest always manifested in localized contests, particularly in a race as close as is indicated here.

Upon the main question, we are presented with this situation: In two precincts the boxes had been invaded and the ballots polluted by some election criminal before they could be counted. In another precinct the invasion of the box was so manifest that it was not opened. In at least one of those precincts the ballots had been crudely changed in the identical race involved in the contest. There is no doubt that in the particular precinct the vote was properly disregarded. Little attention seems to have been directed toward this particular race, for as the sheriff repeatedly stated he was concerned about his own race for jailer. Doubtless there were changes made (of the same character or less crude) in this race in the other two precincts, and they were not noticed. Was the commission authorized to reject the ballots and not count them in the Tickey precinct, and should they have rejected those of the Antioch precinct where the same condition was found as in the Betsy Lane precinct? It would perhaps have been better to have gone into the Tickey box, counted the ballots, and recorded the condition even if they were not to be regarded in the tabulation. That the commission did reject the Antioch precinct is manifested, and we cannot escape the conclusion that the later acceptance of the vote in this race and this race alone was for the specific purpose of changing the result. The situation then is this: In one precinct the votes were not canvassed and in another, although canvassed, the bal-

lots had been wrongfully altered in this and in another race. In a third precinct they were changed in that other race only. It is an accepted rule that where ballots have not been properly cared for by the custodians —formerly the election precinct officers and the county clerk—the court in an election contest will not recount the ballots. In Conley v. Rice, 252 Ky. 370, 67 S. W. (2d) 478, we held that where the integrity of the ballots in one precinct had not been protected since the count by the election commissioners, the court should not have recounted them, but should have accepted the commissioners' certification. In Raymer v. Willis, 240 Ky. 634, 42 S. W. (2d) 918, 921, there had been a delay in the delivery of the ballot boxes to the county clerk, as required by section 1482, Statutes Supp., and the question arose whether that delay in itself required that the ballots therein be rejected. Upon the facts of that case it was held that they were properly counted by the election commissioners. However, it was made emphatic that our conclusion rested on those peculiar facts. The mind of the majority of the court concurring in that conclusion was disclosed in this language:

"It is the opinion of the court that under this law a disobedience of the statutory mandate by failing to deliver the boxes immediately, as required by the statute ,impugns the integrity of the ballots, and they should not be counted unless it is shown by clear and convincing evidence that the ballot box and ballots have not been tampered with and that their integrity has been preserved.

"Of course, it may be disclosed that the delay in the delivery of the boxes was a scheme to defraud, or to create confusion, or to destroy the efficacy of the ballots, or to falsify the contents by persons who are interested in having the precinct thrown out or the ballots rejected. That would be an act with the criminal intent to affect the election or result thereof rather than merely failing to perform a duty. When such corrupt action has been disclosed, a different consideration should be given than that outlined. But we have no such situation before us in this case. * * *

"If there should be such a number of departures from the requirements of the statute relating to the forthwith delivery of the ballot box to the

county court clerk by the designated officers of the election as to indicate a scheme and purpose to violate the statute in that respect so as to furnish opportunities for fraud, and from which an inference could well be made that it was both intended and perpetrated, then a different rule applies, which might possibly require the throwing out of the entire vote cast at such precinct.''

The concurring and dissenting opinions were more emphatic of this attitude.

With the three precincts eliminated, we have approximately 44 per cent. of the entire vote cast in the magisterial district so corrupted that they must be eliminated.

Section 1596a-12, Statutes Supp. 1933, puts upon the courts the duty of declaring that there has been no election and of vacating the office where it appears from the whole record that there has been such fraud, intimidation, bribery, or violence in the conduct of the election that neither contestant or contestee can be adjudged to have been fairly elected. The courts have always been averse to setting aside an election and will not do so if it can be avoided by determining who received a plurality of the legal votes cast. In the application of that principle there has grown up what is called the 20 per cent. rule. That seems to have had its origin in Harrison v. Stroud, 129 Ky. 193, 110 S. W. 828, 33 Ky. Law Rep. 653, 16 Ann. Cas. 1050, where it is recited that about 20 per cent. of the voters had been permitted by the election officers to ignore the constitutional and statutory requirements, and that was sufficient to materially affect the result so it could not be regarded as a lawful election. That percentage became a criterion, but it is not a rigid or an arbitrary mathematical measurement. The rule of measurement is but an interpretation of the statute. Where it is not possible to separate the good from the bad votes and thereby ascertain that one candidate received a plurality of the legal votes, ''where the very warp and woof of the whole fabric is so intermingled with validity and invalidity the two cannot be separated,'' and it appears that the result of the election cannot be determined by any reasonable method, the election will be declared void. Scholl v. Bell, 125 Ky. 750, 102 S. W. 248, 31 Ky. Law Rep. 335; Taylor v. Nuetzel, 220 Ky. 510, 295 S. W. 873; Land v. Land, 244

Ky. 126, 50 S. W. (2d) 518; Caudill v. Stidham, 246 Ky. 174, 54 S. W. (2d) 654; Johnson v. Caddell, 251 Ky. 14, 64 S. W. (2d) 441.

There may have been a fair election held in this race (although that was questioned in the contest), but it was not possible for the courts to adjudge it to be such. The facts are such that the court could do nothing else but declare that there was no election.

Wherefore the judgment is affirmed on both appeals.